J-S76045-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: K.J.G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.F.G. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1382 WDA 2018 |

Appeal from the Order Entered September 6, 2018
In the Court of Common Pleas of Blair County Orphans' Court at No(s):
No. 2018 AD 30

BEFORE:  BENDER, P.J.E., KUNSELMAN, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:                    **FILED JANUARY 09, 2019**

J.F.G. (Father) appeals from the order involuntarily terminating his parental rights to his minor child, K.J.G. (born August 2017) (Child), pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (b) of the Adoption Act.[1]  After careful review, we affirm.

At the time of Child's birth, Mother tested positive for opiates and Child tested positive for opiates and methamphetamines, and was suffering from opiate withdrawal.  **See** N.T., 11/3/17, at 2-3; N.T., 11/13/17, at 4-7; N.T., 9/4/18, at 2.  Mother admitted to using Percocet without a prescription during pregnancy for back pain, but denied being a habitual drug user.  **See** N.T., 11/13/17, at 7-10.  Following discharge from the hospital, Mother eluded

_____

[1] L.R.W. (Mother) voluntarily relinquished her parental rights to Child.  On the same day Father's rights were terminated, the orphans' court confirmed Mother's relinquishment.  Mother is not a party to this appeal and did not separately appeal.

attempts at contact by CYF and did not take Child to a scheduled ultrasound and sweat test to determine hip dysplasia and cystic fibrosis. *See* N.T., 11/3/17, at 4-5; N.T., 11/13/17, at 7-11; N.T., 9/4/18, at 14.

CYF made contact with Mother on November 1, 2017, at which time she tested positive for opiates. *See* N.T., 11/13/17, at 10-11; N.T., 9/4/18, at 14. CYF also discovered that Father had an active bench warrant; he was arrested the same day.[2] *See* N.T., 11/3/17, at 7; 5/2/18, at 5. Father indicated to CYF that he could not be a placement resource for Child because he was caring for his sick father and elderly grandmother. *See* N.T., 11/3/17, at 7-8; 11/13/17, at 17. On November 2, 2017, CYF filed applications for emergency protective custody and shelter care, which were granted following a hearing. *See* N.T., 11/3/17, at 1-16. Child was placed with her maternal grandparents, M.W. and H.W., where she currently remains. *See* N.T., 11/13/17, at 14.

On November 6, 2017, CYF filed a dependency petition. Child was adjudicated dependent on November 13, 2017, and remained in the legal custody of CYF and physical custody of her grandparents.[3] *See* N.T., 11/13/17, at 1-36. Mother was granted unlimited supervised daytime

---

[2] The warrant was for an unpaid fine related to a traffic citation; Father was released from custody after payment. *See* N.T., 9/4/18, at 103.

[3] The dependency proceedings were incorporated into the record at the termination hearing.

visitation; Father's whereabouts were unknown. *See* N.T., 11/13/17, at 17. The only address CYF had for Father was a Post Office (P.O.) box in Blandburg, Cambria County, Pennsylvania. *Id.* In January 2018, CYF contacted Father through Facebook Messenger[4] and provided him with contact information for the caseworker, Casey Sherrer, as well as contact information for Father's court-appointed attorney and the date, time, and location of the February status conference. *See* N.T., 9/4/18, at 113-14.

The court held a status review conference in February 2018 and a permanency review hearing in May 2018. CYF sought a finding of aggravated circumstances based upon the allegation that Father had failed to maintain substantial and continuing contact with Child for a period of six months. *See* Permanency Review Order, 5/9/17, at 9. Father did not appear at the May 2018 permanency review hearing, was not returning his attorney's phone calls, and had last contacted Mother "a few months ago." *See* N.T., 5/2/18, at 1-4. The motion for a finding of aggravated circumstances was granted, and the court noted in its order that Father apparently resided with his father in Blandburg, Pennsylvania; however, CYF's efforts to communicate with Father were unsuccessful.[5] *See* Permanency Review Order, 5/9/17, at 9.

---

[4] The website Facebook offers an instant messaging application, through which users can text and video message other users.

[5] CYF conducted several LexisNexis Accurint searches in an attempt to locate Father, and mailed letters and made phone calls to addresses and phone numbers associated with those searches; however, Father did not respond. *See* Mot. For Permanency Review Hearing, 8/13/17, at "Exhibit A;" *see also* N.T., 5/2/18, at 3-4; 9/4/18, at 14-15.

Mother signed a consent to adoption on July 16, 2018. *See* Consent to Adoption, 7/16/18, at 1. On August 7, 2018, CYF filed a petition seeking to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (b) of the Adoption Act, and a petition to confirm the consent of Mother. On August 13, 2018, CYF filed a motion for a permanency review hearing and sought to change Child's goal to adoption.

In August 2018, CYF filed a motion for special service, which the court granted, allowing CYF to serve Father by alternate means. CYF contacted Father through Facebook messenger.[6] At that time, Father responded that he was unable to provide for Child as he had been laid off and lacked stable housing. This was the first contact Father made with CYF.

On September 4, 2018, the court convened a hearing on the petitions. At the outset of the hearing, Child's guardian *ad litem*/legal counsel stated on the record that he was able to represent both Child's best and legal interests, because Child was pre-verbal and therefore too young to express a

_____

[6] At the termination hearing, both Mother and Father were present, and through counsel, indicated that they were willing to proceed with the termination/goal change hearing. *See* N.T., 9/4/18, at 5-7. Father stated that he received notice of the petition. *Id.* at 100. On appeal, Father does not challenge the manner of service nor aver that he did not receive actual notice of the adjudicatory and termination hearings. *Cf. In re K.P.*, --- A.3d ---, 2018 WL 6176921 (Pa. Super. 2018) (finding that trial court failed to ensure that mother received notice of hearings in compliance with the Juvenile Act and Rules of Juvenile Court Procedure, where mother failed to appear at hearings and challenged service through Facebook Messenger).

preference.[7]  N.T., 9/4/18, at 1.  CYF presented the testimony of Casey Sherrer (caseworker), Krista Gorman (reunification services), M.W. (maternal grandmother), and Mother, who confirmed her consent to adoption and willingness to have her parental rights terminated.  Father, represented by counsel, testified on his own behalf.

Ms. Sherrer testified that since Child's placement, Father never contacted CYF or maternal grandparents, and never responded to CYF's efforts to contact him.  *See* N.T., 9/4/18, at 14-15.  Father never provided support to maternal grandparents or Mother.  *Id.* at 15-16.  The first contact Father had with CYF was August 22, 2018, after he received a Facebook Messenger message concerning the filing of the termination petition.  *Id.* at 14.  Following the Facebook message, Father called Ms. Sherrer and informed her he did not agree with the petition and did not want to give up his parental rights.  *Id.* at 17-18.  At that time, Father gave Ms. Sherrer several addresses where he could be served; however, she later discovered that Father was living at his father's house, an address at which CYF had previously attempted to serve

---

[7] We briefly address the guardian *ad litem*/legal counsel's representation of Child.  **See In re: K.J.H.**, 180 A.3d 411, 412-414 (Pa. Super. 2018).  The Pennsylvania Supreme Court has held that legal counsel must be appointed to represent a child's interests in a contested termination proceeding.  **In re Adoption of L.B.M.**, 161 A.3d 172, 183 (Pa. 2017) (plurality).  However, a GAL may serve as counsel where there is no conflict between a child's legal and best interests.  **See In re T.S.**, 192 A.3d 1080, 1092-93 (Pa. 2018).  Here, as Child's GAL noted, Child was pre-verbal and too young to express a preference, and thus he could represent her without a conflict between her legal and best interests.  **T.S.**, 192 A.2d at 1092-93.  This representation satisfies the statutory requirements.  **Id.**

Father without success. *Id.* at 16-18. Mail sent to the P.O. box address Father provided came back "return to sender." *Id.* at 18-19. In August 2018, Father informed Ms. Sherrer he was not currently in a position to care for Child because he had been laid off, did not have stable housing, and was helping Mother with her finances. *Id.* at 20. Regarding Child, Ms. Sherrer testified that she is doing well in the home of her maternal grandparents and is very bonded to them. *Id.* at 28-29. Maternal grandparents are a pre-adoptive resource. *Id.* at 29.

Ms. Gorman testified that her contact was mostly with Mother, and she last saw Mother in May 2018, shortly before she signed her consent to adoption. *Id.* at 36. Ms. Gorman had no contact with Father during the pendency of the case, and Mother told Ms. Gorman that she had had no contact with Father. *Id.* at 37. Mother denied living with Father. *Id.*

M.W. testified that she and her husband, H.W., have been caring for Child since Child was approximately two months old; Child has developed well and is happy and well-adjusted. *Id.* at 41-42. Maternal grandparents are willing to adopt Child. *Id.* at 43. Both Mother and Father were present at M.W.'s home when Child was placed into emergency custody, and Father was advised to contact CYF to make arrangements to see Child. *Id.* at 44-45. M.W. believed that at the time of placement, Mother and Father were no longer in a relationship. *Id.* at 44-45. Father never visited, called, or sent any support for Child; he did not send cards or visit on Child's first birthday. *Id.* at 46-48. Additionally, M.W. testified to her concerns regarding drug use by

Father.  *Id.* at 48-49.  Finally, M.W. testified that she and Child are bonded to each other.  *Id.* at 53-54.

Mother testified that she signed a consent to adoption because she believed it was in Child's best interests to be adopted.  *Id.* at 59-62.  She described her relationship with Father, who is possibly still legally married to his first wife, as "we talk."  *Id.* at 68, 74.  Mother testified that Father had been advised about contacting CYF to see Child if he wished, but he has not seen Child face to face since her placement in November 2017.  *Id.* at 76-77, 82-87.  Father has never provided support for Child.  *Id.* at 69, 76-77.  Mother testified that Father provided one birthday card and a gift for Child, but she did not tell M.W. the gift was from Father because she did not want to cause conflict.  *Id.* at 68-70.  Mother also testified that Father had used marijuana in the past but she was not sure if he was currently using marijuana.  *Id.* at 77-79.  Mother stated that she often posts pictures of Child to Facebook, but she did not specifically send pictures of Child to Father.  *Id.* at 87.  Mother had chats with Father through Facebook Messenger in June or July 2018, with Child present; this contact was initiated by Mother.  *Id.* at 65-66, 84.

Father testified that he lives at his father's house in Blandburg, Pennsylvania, and has lived there throughout the pendency of this matter, despite the fact that he informed caseworkers he was living at a different address and did not respond to attempts at service there.  *Id.* at 90, 100-01. Father also has a P.O. box address where he receives his mail.  *Id.* at 91.  He stated that the last time he spoke to the agency was when he received the

August 2018 Facebook message. *Id.* at 91-92. Father believed he and Mother were still in a relationship; that they spoke every day; that they were planning to move in together; and that he asked about Child "two, three, maybe four times a week." *Id.* at 92. Father claimed to have had five to seven Facebook video chats with Mother and Child, and asserted that Child recognizes him, smiles, and laughs when she hears his voice. *Id.* at 93-94. Father stated that he never visited Child due to the animosity between him and maternal grandparents. *Id.* at 94.

Father claimed that CYF was "playing games" and attempting to pit him and Mother against each other. *Id.* at 97. Father admitted to marijuana use, but claimed it was to cope with chronic headaches, pain, and depression. *Id.* at 104. Additionally, Father claimed that he had lived with Mother at her apartment, though Mother denied this. *Id.* at 108.

Following the hearing, the court terminated Father's parental rights pursuant to Section 2511(a)(1), (2), (5), and (b), and changed Child's permanency goal to adoption.[8] Father timely appealed and filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father raises the following issues for our review:

> I. Whether the lower court erred and abused its discretion by terminating the rights of [Father], despite clear evidence that [Father] had continuing and ongoing contact with the subject child.

---

[8] Father does not appeal the goal change order.

II. Whether the lower court erred and abused its discretion by finding [Father] had a clear and settled purpose of relinquishing [his] rights to the subject child.

Father's Brief at 5 (unnecessary capitalization and answers omitted).

We review cases involving the termination of parental rights according to the following standards:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotations omitted).

Here, the court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (b). Termination requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between

parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). To affirm, we need only agree with any one of the subsections of 2511(a), as well as subsection (b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Instantly, we focus our analysis on subsection (a)(2) and (b).

The relevant sections of 23 Pa.C.S.A. § 2511 provide:

**(a)** **General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*\*\*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

To satisfy the requirements of Section 2511(a)(2), the moving party must prove "(1) repeated and continued incapacity, abuse, neglect or refusal;

- 10 -

(2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *See In Interest of Lilley*, 719 A.2d 327, 330 (Pa. Super. 1998). The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied. *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties. *Id.*

Father contends that CYF did not prove by clear and convincing evidence that his rights should be terminated. *See* Father's Brief at 10-11. He argues that he attempted to keep in contact with Mother throughout the proceedings, although he suffered from numerous hardships, including sick relatives and the lack of a car. *Id.* Father claims he was attempting to avoid confrontation with maternal grandparents, and accordingly, did not visit Child in placement.[9] *Id.* at 11.

Father's averments are belied by the record. The evidence introduced at the hearing showed that, as of the date of termination, the last time Father saw Child in person was the date she was taken into care. From the beginning, Father indicated to CYF that he was not an appropriate placement resource

---

[9] Father's second issue apparently focuses on Section 2511(a)(1) and argues that he did not show a settled purpose to relinquish his rights, and that CYF prevented him from seeing his daughter. *Id.* at 13. As we discuss the appropriateness of termination pursuant to Section 2511(a)(2), we need not discuss Section 2511(a) further.

for Child. Despite CYF's intensive efforts to contact Father at addresses and phone numbers **he provided**, as well as at other addresses gleaned from Accurint searches, Father did not respond. Father did not attend status conferences, permanency review hearings, or Child's dependency adjudication. Father provided various addresses and phone numbers to CYF, but mail was returned marked "return to sender," and Father did not answer phone calls. Further, Father claimed that he could not visit Child due to his poor relationship with maternal grandparents. However, evidence was introduced that Father was advised to contact CYF to set up supervised visitation through the agency to avoid any confrontations. Indeed, based upon Father's complete lack of contact with Child, an aggravated circumstances order was entered against him. Despite Father's insistence that he was involved in Child's life, and that he asked Mother about Child "several times a week," the orphans' court found Father's testimony to be "self-serving and not credible." **See** Trial Court Opinion, 9/28/18, at 17.

Consistent with the foregoing, we discern no error in the orphans' court's finding that competent, clear and convincing evidence supported the termination of Father's parental rights pursuant to Section 2511(a)(2), based upon Father's continued neglect – his failure to contact Child or CYF in any form or fashion for almost the entirety of Child's placement – that resulted in Child being without essential parental care, the cause of which "cannot or will not be remedied." **See Lilley**, 719 A.2d at 330; **Z.P.**, 994 A.2d at 1117.

Next, we consider whether Child's needs and welfare will be met by termination pursuant to subsection (b). Father makes no effort to argue that the trial court abused its discretion with regard to this section or, advance any concrete argument regarding the needs and welfare of Child. Accordingly, he risks waiver of the issue. *See In re Adoption of R.K.Y.*, 72 A.3d 669, 679 n.4 (Pa. Super. 2013) (declining to address subsection 2511(b) where the appellant did not make an argument concerning that subsection). Even if Father did not waive the issue, his arguments would lack merit.

In the context of a needs and welfare analysis, "the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Z.P.*, 994 A.2d at 1121. The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well. *Id.* Ultimately, the concern is the needs and welfare of a child. *Id.* Where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008).

We have stated:

> [b]efore granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider

whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

**Z.P.**, 994 A.2d at 1121 (quoting **In re C.S.**, 761 A.2d 1197, 1202 (Pa. Super. 2000)).  The trial court may equally emphasize the safety needs of the child and may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.  **See In re N.A.M.**, 33 A.3d 95, 103 (Pa. Super. 2011).  "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment."  **In re B.,N.M.**, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

Here, the record is devoid of any evidence of a parental bond between Child and Father.  **See**, **e.g.**, **K.Z.S.**, 946 A.2d at 763.  The last time Father saw Child in person was when she was approximately two months old.  Father may have video messaged with Mother twice in the summer of 2018, but Mother stated that she did not think Child knew Father was there.  Father claimed that Child recognized him and laughed and smiled when she saw him, but the orphans' court found Father's testimony to be self-serving and not credible.

In contrast, Child has been in a safe and stable home environment with her maternal grandparents, who are able to care for her around the clock, and where Child may often visit with Mother and other relatives.  The orphans' court observed:

> The subject child is with family members, the maternal grandparents, who have provided a loving, safe, secure and stable environment since November 1, 2017, just two months after the child's birth. The child has a loving attachment and bond with her maternal grandparents. She is able to have significant contact with her biological mother, which the maternal grandparents will continue to encourage into the future. In consideration of the child's developmental, physical and emotional needs and welfare, we are satisfied that termination of the parental rights of the parents, so that child may be adopted by the maternal grandparents, is in the child's best interest and welfare as set forth in 23 Pa.C.S.A. § 2511(b).

Trial Court Opinion, 9/28/18, at 19-20.

We discern no abuse of discretion in the trial court's conclusion. Accordingly, clear and convincing evidence supports the orphans' court's termination of Father's parental rights under Sections 2511(a)(2), as well as the Section 2511(b) findings that there was no bond between Father and Child, and that adoption would best serve Child's needs and welfare. *See* ***Z.P.***, 994 A.2d at 1126-27; ***K.Z.S.***, 946 A.2d at 763.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/9/2019

- 15 -